**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **No. 10 CR 617** |
| | ) | **Honorable Amy St. Eve** |
| | ) | |
| **JOEL RIVAS,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT JOEL RIVAS' MOTION FOR JUDGEMENT OF ACQUITTAL**
**AFTER RETURN OF VERDICT**

Defendant Joel Rivas, by his attorney, Linda Amdur, pursuant to Rule 29 ( c ), of the

Federal Rules of Criminal Procedure, respectfully renews his motion for judgement of acquittal

after return of the jury's verdict on the grounds that the evidence was insufficient to sustain

convictions of conspiracy to possess with intent to distribute and to distribute 5 kilograms or

more of cocaine and a quantity of marijuana, in violation of 21 U.S.C. § 846 (Count One);

possession with intent to distribute cocaine and a detectable quantity of marijuana, in violation of

21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Two); possession of a firearm in furtherance of a

drug trafficking crime, in violation of 18 U.S.C. § 924 ( c ) (Count Three); and two counts of

unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (e) (Counts

Four and Five).  In support of this Motion, the following is offered:

**I.      Applicable Legal Standard**

The Constitution requires the government to prove guilt beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 313-14 (1979).   The district court properly grants a

Rule 29 ( c ) motion, when the "evidence is insufficient to sustain a conviction." *United States*

*v. Jones*, 713 F.3d 336, 341 (7th Cir. 2013). When reviewing the sufficiency of the evidence, this

court should view the evidence in the light most favorable to the government and determine

whether any rational trier of fact could have fund the essential elements of the crime beyond a

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

## II.    Factual Background

### A.    The Raid On February 18, 2010, At The Storage Unit In Elgin

On February 18, 2010, Elgin police officers executed a search warrant for storage unit #5

located at 1460 Illinois Parkway in the city of Elgin, Kane County, Illinois. Codefendant Ismael

Miranda was present at the storage unit at the time of the search. During the search, officers

recovered approximately 229.8 grams of cocaine, 372.4 grams of marijuana, and two handguns.

Officers also recovered two digital scales, a vacuum sealer, plastic bags, a wire detection device,

a bottle of inositol powder, numerous documents, and various other items. Miranda was arrested

and charged with various state drug and firearm offenses.

When the Elgin police entered the storage unit, Miranda was standing near a red Mac tool

chest. Julio Gonzales was working on a semi-truck located in the middle of the unit. Lettering

on the truck read "Lions Tribe Trucking."

Numerous documents were recovered from the storage unit bearing the name of Ismael

Miranda while only a few documents were associated with Rivas. Inside the truck were bills and

traffic tickets in the name of Ismael Miranda, applications for an employer's identification

number ( EIN )  and applications to the Illinois Commerce Commission in Miranda's name,

corporate documents showing Miranda as President of Lions Tribe Trucking, and letters from an

2

insurance company to Miranda. In the red Mac tool chest, police recovered two bags of cocaine weighing 87.7 grams and 140.0 grams respectively, a .357 caliber handgun along with ammunition, and a radio frequency scanner. There were also bills sent to Miranda and bill payment stubs showing payment to Miranda for Lions Tribe Trucking. In a small office located in the upstairs of the unit, a plastic bag containing 372.5 grams cannabis was recovered from a mini-refrigerator. A 9 mm. handgun, a small digital scale, and an inositol bottle were recovered from a desk in the office. Also located in the desk were hospital bills with Miranda's name, paperwork from the U.S. Department of Transportation sent to Miranda, Miranda's business card for Lions Tribe Trucking, a Western Union receipt showing Joel Rivas as sender of $130 to Mexico, 2 blank service sheet invoices for mechanic services with Joel Rivas' phone number, and a Rock Valley College notebook, which was recovered in the same drawer as the handgun. A black brief case was sitting on a chair in the office. The brief case contained documents for Miranda and Lions Tribe Trucking. Ismael Miranda was listed as the owner of Lions Tribe Trucking. A blue work shirt with the name "Tony" was hanging on a door in the office. Inside a pocket of the shirt was a small plastic bag containing 2.1 grams cocaine.

Calvin Stringer was the owner of the storage unit complex located at 1460 Illinois Parkway. He testified that in fall 2009, he rented unit #5 to Ismael Miranda. He also testified that he purchased the complex 5 years ago and rented the unit 5 or 6 months after the purchase. He charged Miranda $500 per month in rent, although he received the actual payments of money from both Miranda and Rivas. According to Stringer, Miranda owned a trucking company called Lions Tribe Trucking, and kept a truck in the unit. Miranda also ran a car repair and painting business out of the unit. Stringer testified that Miranda, Rivas, and another male worked at the

unit.  Stringer  also testified that after the raid, he locked the storage unit because he was

concerned that tools and other expensive equipment might be removed from the unit.  Rivas

called Stringer and said he wanted his tools, but Stringer never permitted Rivas to get his tools

until Miranda was released from custody and returned to the unit.

### B.  The Cooperating Witnesses

To prove the Counts of conviction, the government offered the testimony of cooperating

witnesses  Mark Liby and Corey Glass, both of whom were drug dealers, drug addicts, and

convicted felons who were receiving benefits from the government in return for their testimony.

### 1.  Mark Liby

Mark Liby grew up in Monmouth, Illinois.  By 17, he smoked marijuana daily and

snorted cocaine.  He soon moved on to crack cocaine, LSD, and amphetamines. He sold drugs to

pay for his drug use and soon became addicted to all of the drugs that he used.  He only stopped

using drugs when he went to prison.  In 1992, he was convicted of forgery after he stole checks

from his mother purse to pay for crack and went to Illinois Department of Corrections (IDOC)

for 3 years.  In 2001, he was convicted of unlawful delivery of controlled substance and

sentenced to 5 years in IDOC.  In 2006, he was convicted of possession with intent to deliver

controlled substance and sentenced to 8 years in IDOC.

 On July 9, 2010, he was arrested after a search warrant was executed at his residence in

Monmouth, and cocaine, methamphetamine, and crack cocaine were recovered.  He decided to

cooperate with law enforcement on the day of his arrest and took officers to his uncle's residence

where he had stored a kilogram of cocaine.   When he provided information to the authorities he

said he had received the cocaine from Refugio Castaneda and had purchased some 15 to 20

kilograms from Castaneda in the past. At the time of his arrest, he never mentioned Rivas as a supplier of cocaine.

In 2012, Liby pled guilty pursuant to a plea agreement and was convicted in the Central District of Illinois of conspiracy to distribute crack cocaine, methamphetamine, and cocaine. Liby was the leader of the conspiracy and provided drugs to his family members who in turn sold the drugs to numerous customers in downstate Illinois. Pursuant to the his plea agreement, Liby agreed to cooperate, and the government agreed to move to reduce his sentence as a result of the cooperation that he had provided up until the time of his sentencing. Liby was sentenced to 292 months in the Bureau of Prisons.

Based upon his sentence of 292 months, Liby was looking at a release date of September 20, 2031. At the time Liby testified at Rivas' trial, he hoped to receive a further reduction in sentence in return for assistance to the government by testifying at Rivas trial. He recognized, however, that it was totally within the discretion of the government to move for further reduction in his sentence.

At trial, Liby testified that he obtained marijuana and cocaine from Joel Rivas from 2007 until 2010 with a break of 6 or 7 months, from September 2009 until February 2010, when he was incarcerated on a parole violation. Liby gave mostly a vague account of his dealings during this time. For example, he testified that he did 3 or 4 deals with Joel Rivas at a bar in Peoria. When asked on cross-examination, he could not recall when he did the first, second, third, or fourth deal. He testified he did five or six deals with Rivas in Mendota. He could not recall when he did any of the deals. He also testified that he did deals in Galesburg, but could not recall how many deals or when the deals took place. Liby testified that he purchased more

marijuana than cocaine from Rivas.

Although Liby generally had a vague recollection of his dealings with Rivas, he recalled a few specific instances. Liby testified that he met Joel Rivas while both were living at a work release center located in Peoria, Illinois. While at the center, Liby went home on week-end passes and sold drugs. He was supplied drugs by Refugio Castaneda – mostly cocaine, but some marijuana. Liby claimed that about one year after he met Rivas, he asked Rivas to get him cocaine. But Liby acknowledged that he did not recall what he said when he went to a proffer on September 30, 2010, and he may have told agents weed or cocaine. According to Liby, Rivas told him he would arrange to have some one meet him, and gave him a telephone number of a person named "Mexico." Liby claimed he met Mexico in a Mexican restaurant in Elgin. They ate in he restaurant, left, and Mexico gave Liby cocaine when Liby got into his car. Liby acknowledged that he made the plans to meet with Mexico in the restaurant, but denied that he ever discussed with Mexico what he was picking up or how much he was paying. Liby was expecting to receive 4½ ounce cocaine, but when he got home he realized he was short ½ ounce. Liby claimed he told Rivas he was short, and Rivas told him to pay for only 4 ounces. Liby acknowledged that when he met with agents on December 8, 2010, that it may have been the first time that he told them that he had been shorted in a cocaine deal.

The next deal that Liby claimed he did with Rivas was in Belvidere, Illinois, sometime after he left the work release center. Liby left the work release center September 19, 2008. Liby claimed he drove to Belvidere, Illinois, and Rivas took him to a car lot. Rivas and Liby went into a bathroom at the car lot and Rivas weighed out 4½ ounces cocaine on a small scale. Rivas, some one Rivas claimed was his brother, and Liby's girlfriend were all present for the deal. Liby

paid Rivas one or two weeks later.

Liby claimed he did deals with Rivas at a storage unit in Elgin. Liby testified that Mexico was not part of any his dealings with Rivas at the storage unit. T. 300. When he went to the unit, he saw Mexico and Rivas working on cars. He saw marijuana in the storage unit, and he went into the office a couple times. Liby claimed that he and his girlfriend went to the storage unit and into the office a few days before the unit was raided. He testified this was shortly after he was discharged from prison. But he also acknowledged that as soon as he left prison, Refugio Castaneda came to his house to sell him cocaine. He testified that Castaneda was bringing him kilograms, but claimed he needed cocaine from both Castaneda and Rivas, "I'd take as many as I could get." T. 303. According to Liby, while in the office, Rivas took a gun from a desk drawer, put it on top of the desk, and then put it back in the desk drawer. Liby only knew it was some kind of handgun with a clip. Liby wanted the gun, but Rivas put the gun back in the desk drawer. Rivas had a duffel bag on the floor and took 5 pounds marijuana from the duffel bag and gave it Liby.

After the raid at the storage unit, in spring 2010, Liby claimed that he met Rivas at the Papa Bear restaurant near Aurora to purchase one kilogram of cocaine. The cost of the cocaine was $29,000, but Liby did not pay "up front." Rivas gave Liby a gun in addition to the cocaine. Liby did not want the gun but took it because he had asked for a gun. Some one else was there, but Liby did no know the other guy's name. Although Liby claimed he met Rivas other times at Papa Bear he never gave any details except for the time when he purchased a Kia from Rivas. Liby did not know when he first met Rivas at Papa Bear.

Lastly, Liby testified about a drug deal with Rivas that took place at a bar in Peoria

7

sometime in 2010. He could not recall the season. Rivas, Mexico, and Liby's girlfriend were present. Liby was expecting to get 5 pounds of marijuana. According to Liby, Mexico had a safe in pickup, and Mexico could not open the safe using the combination. Liby testified they wanted to sell him the safe and had the combination and phone number of a locksmith on a piece of paper, but Liby did not want to buy the safe so Rivas gave it to him. Liby took the safe home, and a friend cut it open and took out the marijuana. Liby acknowledged that he never told agents where the safe was located after his July 2010 arrest, and claimed it was long gone. Although Liby claimed there were other meetings at the bar in Peoria, he never described any of them.

As to cocaine, Liby claimed that after the first deal at the work release center, the quantities of cocaine that he got from the defendant included, "4½ ounces a couple times, nine ounces once and a couple times maybe, and kilo two or three times." T. 246. Of these cocaine deals summarized by Liby, he provided specific testimony only with regard to the 4-ounce deal and one kilogram deal at the Papa Bear restaurant.

### 2. Corey Glass

Government witness Corey Glass, just like Mark Liby, was a drug dealer, drug addict, and convicted felon who was receiving benefits from the government in return for his testimony regarding Joel Rivas. Glass had previously been convicted of robbery, convicted of unlawful use of a weapon in 1999 and sentenced to 18 months IDOC, and convicted of possession with intent to deliver cocaine in 2000 and sentenced to 6 years in IDOC. In early December 2009, a search warrant was executed at his residence in Peoria and 11 ounces of cocaine and a firearm were seized. Glass was charged federally in the Central District of Illinois with possession of a controlled substance with intent to deliver and possession of a firearm by a felon. He pled guilty

pursuant to a plea agreement of cooperation, which meant he was to testify about his interaction

with Joel Rivas and Rivas' acquaintances. Glass had been sentenced to 240 months incarceration,

but expected a reduction in sentence in return for his testimony in this case. Glass hoped to be

released after he completed his testimony in this case.

Glass claimed he purchased both marijuana and cocaine from Rivas. Glass met Rivas

when Rivas was at the work release center in Peoria in 2007. Rivas came to work at G&D

Integrated where Glass was a supervisor. Glass was selling marijuana to employees and others at

that time. Glass was Rivas supervisor and gave Rivas good performance reviews as an employee.

When Rivas left in the summer of 2008, Glass told Rivas he could use him as an employment

reference. In the later part of 2008, Glass testified he began to purchase marijuana from Rivas,

and claimed that in April 2009, he began to purchase cocaine from Rivas. Glass testified that he

purchased marijuana from Rivas five to ten times. Glass also claimed that he purchased powder

cocaine from Rivas five to ten times and all of his purchases were in 2009. T. 385. Glass

purchased a ½ ounce the first time he purchased cocaine, and then came back and purchased an

ounce. He testified that "I think that the following time I bought another ounce; and then, it

progressed to, like two ounces." T. 385. The greatest amount was 18 ounces. He claimed he

purchased 18 ounces "maybe four or five, maybe six times. Maybe six." T. 385. Glass testified

that he met two Hispanic men that sometimes accompanied Rivas – "Joe" and a person who Rivas

introduced as his "right hand man." Glass identified a photo of Ismael Miranda as the right-hand

man. Government Exhibit Photo A. Glass first met Miranda at a bar in Peoria called "Tomcats."

Although Glass had met with agents and been cooperating from the time of his arrest in December

2009, he never told the prosecution about his meeting at Tomcats until July 2, 2013,

approximately 2 weeks before trial.  Glass testified that at the meeting at Tomcats,  Glass paid

Rivas some money that he owed him for cocaine or marijuana.

Glass claimed Miranda was present 3 or 4 times when he bought drugs from Rivas.  T.

394.  Glass testified he met Rivas a few times at Joe's Crab Shack in Peoria.   The first time they

met at the Crab Shack,  Glass purchased cocaine, but he could not remember the quantity or what

he paid.  Miranda gave the package to Rivas, and Rivas gave the package to Glass.  As with the

meeting at Tomcats, the first time Glass told the prosecution about his meeting and purchase of

cocaine at Joe's Crab Shack was on July 2, 2013.   Glass also saw Miranda at the storage facility

in Elgin two or three times where he went to purchase drugs.  Glass testified that at the conclusion

of one of the deals Miranda walked him to his vehicle and asked if Glass wanted him "to stash"

drugs in the panel of the vehicle.  As with other information about Miranda, Glass told the

prosecution about Miranda's offer to hide drugs in the panel for the first time on July 2, 2013.

Glass bought cocaine or marijuana from Rivas at least 5 times at the storage unit.  He testified that

the storage unit was primarily open space set up to do mechanical work on cars.  At one point

Rivas wanted to purchase a firearm, and Glass gave Rivas a firearm to reduce his drug debt by

$300.   Glass identified the handgun that was recovered from a desk drawer in the office of the

storage unit as the same handgun he gave to Rivas to reduce his drug debt.  Glass testified that he

had received the gun from a drug dealer in Chicago, but then changed his testimony and said the

drug dealer who gave him the gun was from Peoria.

### C.  Forensic Scientist Edward Rottman

Edward Rottman testified that he is a fingerprint examiner employed by the Illinois State

Police.  He recovered one latent fingerprint from the 9 mm handgun that was recovered  from the

desk drawer in the office of the storage unit. The latent fingerprint was a partial print. He compared the partial print with the right index fingerprint on a "Joel Rivas" fingerprint card. He determined that the latent print on the 9 mm handgun was made by the same person whose fingerprints appeared on the "Joel Rivas" fingerprint card. He used the ACE-V methodology. He was "totally certain" that the latent fingerprint on the handgun was made by the same person whose prints were on the fingerprint card.

He acknowledged on cross examination that he did not know of any studies that have validated the method he used to conduct his comparison and analysis – the ACE-V method. He also acknowledged that it is possible that a small segment of fingerprint of one individual is similar to a small portion of a fingerprint of another. As set forth in Rivas Motion For New Trial, the defense was not permitted to question Rottman regarding the Brandon Mayfield case, where FBI fingerprint experts initially misidentified Mayfield based upon comparison of a partial latent print recovered from a bomb with the known fingerprints of Mayfield.

### D. Rivas Acknowledged That He Distributed Marijuana To Both Liby and Glass

At trial Defendant Rivas acknowledged both through his own testimony and through arguments of counsel, that he distributed marijuana to government witnesses Mark Liby and Corey Glass. More specifically, he acknowledged that in March 2009, he met Corey Glass at a MacDonald's in Chicago and directed him a storage unit in Elgin where he sold Glass 2 pounds of conventional weed for $800 per pound. After that meeting, from March 2009 until early December 2009, Rivas met with Glass approximately once a month and Glass purchased one pound of hydro for $2,500. After Glass was arrested on December 3, 2009, Glass arranged to have Rivas meet with Glass' wife and he sold her one pound of dro for $2,500.

11

Rivas also acknowledged that approximately one month after he first sold marijuana to Glass, he sold marijuana to government witness Mark Liby. The first time he sold to Liby, he sold two pounds of conventional marijuana for $800 per pound. Following the first sale to Liby, Rivas sold Liby five or six pounds of dro from March or April 2009 until Liby was incarcerated in September 2009. One of the times that Rivas sold Liby dro was at the storage unit when he also sold Liby a 1998 Civic Honda. After Liby was released from prison in early 2010, he called Rivas. They met a month later at the Papa Bear Restaurant across from a mall near Aurora. Rivas sold Liby a Kia for $2,500 and also some dro. Rivas testified that Miranda did not participate in his deals with Liby or Glass.

## III.    Counts of Conviction

### A.   Count One (Conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine and a quantity of marijuana)

As to the conspiracy charged in Count One, the evidence falls woefully short of proving Joel Rivas conspired with Miranda to possess with intent to distribute or to distribute mixtures containing 5 kilograms of cocaine.

First as to the drugs seized during the raid at the storage unit, Rivas was not present at the time of the raid, and, as noted in Rivas Motion For New Trial, the government misstated the evidence when arguing that Rivas testified he met Liby at the storage unit soon after Liby was released from prison in February 2010. The government's evidence did not establish beyond a reasonable doubt when Rivas was last at the unit.

Equally important, the government's evidence established that the storage unit was Miranda's, and showed only that Rivas worked there. The owner of the unit, Calvin Stringer,

testified that he rented the unit to Ismael Miranda.  Stringer testified that Miranda owned Lions

Tribe Trucking and also ran a car repair and painting business out of the unit.  Stringer testified

that Rivas and another man worked there.

     Numerous documents recovered from the unit confirmed that storage unit # 5 belonged to

Miranda and was his place of business.  Inside the truck were bills and traffic tickets all in the

name of Ismael Miranda, applications for an EIN and applications to the Illinois Commerce

Commission in Miranda's name, corporate documents showing Miranda as President, and letters

from an insurance company sent to Miranda.  In the red Mac tool chest where bags of cocaine, the

.357 caliber handgun,  and a radio frequency scanner were recovered, there were bills that had

been sent to Miranda and bill payment stubs that showed payment to Miranda for Lions Tribe

Trucking.  The .357 revolver and radio frequency scanner were located on top of this paperwork.

See Government Exhibit Photo 6.   In the desk located in the small office space,  were hospital

bills with  Miranda's name, paperwork from the U.S. Department of Transportation sent to

Miranda, and Miranda's business card for Lions Tribe Trucking.  Miranda's black brief case was

sitting on a chair in the office.  In his briefcase were personal documents bearing with Miranda's

name and Lions Tribe Trucking documents.  On the trucking documents, Ismael Miranda was

listed as the owner of Lions Tribe Trucking.  Of all of the documents recovered from the storage

unit, only 4 could be associated with Rivas: a Western Union receipt, two blank service sheet

invoices for mechanic services showing Rivas' phone number on the heading, and a Rock Valley

College handbook for the preceding school year of 2008 -2009.

     As to Liby's and Glass's testimony, they both were convicted drug dealers, who expected

benefits from their testimony and had good motive to lie.

Liby had previously been convicted of a crime of dishonesty, and when he began cooperating, the supplier he named was Refugio Castaneda, not Joel Rivas. When Liby testified, he had already been sentenced to 292 months in the Bureau of Prisons and was looking at a release date in September 2031. While he did testify to receiving 4 ounces of cocaine from Mexico that was arranged by Rivas and a kilogram from Rivas at a restaurant, Liby acknowledged that Miranda was not part of any dealings he had with Rivas at the storage unit. Liby claimed that on another occasion Miranda accompanied Rivas when he brought a safe with 5 pounds of marijuana to Liby, but Liby's story made little sense. Rivas could not open the safe and supposedly gave Liby the combination on a piece of paper with the phone number of a locksmith. Liby did not use the combination or the locksmith, but instead cut the safe open with the help of a friend. Liby testified the safe was longer available.

Glass like Liby was a drug dealer, drug addict, and convicted felon who was receiving benefits from the government in return for his testimony. He had already been sentenced to 240 months incarceration, and hoped to be released after he completed his testimony in Rivas' case. Glass claimed he purchased cocaine from Rivas five to ten times. Glass claimed that Miranda sometimes accompanied Rivas, and that Rivas called Miranda his "right-hand man." Glass began meeting with agents and cooperating with the government from the time of his arrest in December 2009. But Glass never told the prosecution about his meetings with Rivas when Miranda was present until July 2, 2013 – more than three years after his arrest and less than two weeks before Rivas' trial.

The defense asks this court to vacate Rivas's conviction on Count One based on the government's failure to prove beyond a reasonable doubt that Rivas conspired with Miranda to

14

possess with intent to distribute or to distribute mixtures containing 5 kilograms of cocaine.

If for any reason this Court does not vacate the conviction in Count One as to distribution of cocaine , the defense continues to request that this court vacate the conviction with respect to the jury's finding that as to Defendant Joel Rivas, the conspiracy offense involved 5 kilograms of more of mixtures containing cocaine. The government failed to prove beyond a reasonable doubt that with respect to Rivas the offense involved 5 kilograms or more.  Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt.  Mandatory minimum sentences increase the penalty for a crime.  It follows then, that any fact that increases the mandatory minimum is an "element" and must be submitted to the jury and proven beyond a reasonable doubt.  *Alleyne v. United States*, ___ U.S.___, No 11-9335, decided June 17, 2013.  Even if the evidence is viewed in the light most favorable to the government, the government did not prove beyond a reasonable doubt that Rivas conspired with Miranda to possess with intent to distribute or to distribute 5 kilograms or more of cocaine.

In Opening Argument, with regard to the quantity of cocaine,  the government argued that the conspiracy involved more than 5 kilograms of cocaine.  More specifically, with respect to the storage unit, the government argued that the following quantities applied:

| | | |
|---|---|---|
| Government Exhibit 1 | | 2.1 grams [from shirt w/name "Tony"] |
| Government Exhibit 2 | | 87.7 grams [bag from red tool box] |
| Government Exhibit 3 | | 140.0 grams [bag from red tool box] |
| | Total | 229.8 grams |

With respect to Mark Liby's testimony, the government argued that the following quantities applied:

| | |
|---|---|
| first deal for 4 oz. | 112.0 grams [4 x 28] |
| 2 deals w/Liby for 4½ oz. | 252.0 grams [4.5 x 28 x 2] |
| 1 deals w/Liby for 9 oz. | 504.0 grams [9 x 28 ] |
| deal at Papa Bear in Aurora | 1,000.0 grams [1 kilogram] |
| other kilogram | 1,000.0 grams [1 kilogram] |
| | 2,868.0 grams |

With respect to Corey Glass' testimony, the government argued the following quantities applied:

| | |
|---|---|
| first deal for ½ ounce | 14.0 grams [½ x 28] |
| 2 deals w/Glass for 1 oz. | 56.0 grams [2 x 28] |
| 2 deals w/Glass for 2 oz. | 112.0 grams [2 x 28] |
| 1 deal w/Glass for 9 oz. | 252.0 grams [9 x 28] |
| 4 deals w/Glass for 18 oz. | 2,016.0 grams [18 x 28] |
| | 2,450.0 grams |

Thus, based upon the governments argument, the amount of cocaine involved in the conspiracy totaled 5,547.8 grams.

With respect to the drugs recovered at the storage unit, Rivas was not present at the time of the raid, and the government did not establish that at any time he conspired to possess or to distribute those drugs. The unit was rented by Miranda, and Rivas worked there. Numerous documents recovered from the unit confirmed that the unit belonged to Miranda and was his place of business. There was no evidence that Rivas ever possessed the drugs recovered from the unit constructively, jointly or otherwise. There was no evidence that Rivas knew that the drugs were present at the unit. In the March 3, 2010, Kane County Jail call, when Miranda told Rivas that his charges carried from 6 to 30 years "because they found that shit garbage that was there," Rivas responded "Where? What garbage." Govt. Exhibit 3/8/10 Call Transcript at ll. 216-224. This

16

exchange demonstrates that Rivas did not know that drugs were stored in the unit on February 18, 2010.  For all of the above reasons, the 229.8 grams of cocaine recovered from the unit should not be counted as drugs that Rivas conspired to possess with intent to distribute or to distribute.

With respect to the quantity of cocaine involved in the conspiracy based upon Mark Liby's testimony,  Liby testified that he obtained nine ounces of cocaine from Rivas "once and a couple times *maybe*."  Even if his testimony is taken in the light most favorable to the government, his testimony did not establish beyond a reasonable doubt that received two nine ounce quantities from Rivas, and the government's total for Liby should be reduced by 252 grams resulting in a total of 2,616 grams of cocaine based on Mark Liby's testimony

With respect to the quantity of cocaine involved in the conspiracy based on Corey Glass's testimony, Glass testified to purchasing two ounces on only one occasion.  T. 385.   Based on Glass's testimony regarding only one two-ounce quantity, the government's total for Glass should be reduced by 56 grams.

More importantly, Glass's testimony regarding the 18 ounce quantities was simply unbelievable.  He claimed that in less than 8 months time, he was able to increase his cocaine distribution 18-fold, and claimed that he ultimately purchased 18 ounces of cocaine from Rivas on at least four occasions.   Although he claimed he increased his purchases from Rivas 18-fold, he was relatively uncertain as to whom he sold these large amounts of cocaine.  When Glass purchased these larger quantities, he worked 40 hours a week at G & D Integrated, drove to meetings with Rivas in areas as far away as Elgin (150 miles), cooked the cocaine into crack at some location other than his home, and then broke it down and sold it to his vaguely identified customers.   In addition, his testimony did not tie Miranda to these larger amounts.  Glass claimed

17

that Miranda was present three to four times when he met with Rivas, but never provided to the government the information concerning the meets at Tomcats and the Crab Shack until the eve of trial in spite of the fact that he had begun cooperating in December 2009. Of the times Glass claimed Miranda was present, he was able to testify to only one transaction that concerned cocaine, which was the first transaction at Joe's Crab Shack. Thus, based upon the quality of Glass testimony regarding his 18-ounce purchases and the fact that he never tied Miranda to these purchases, the defense requests that this court vacate the jury's finding that the conspiracy involved 5 kilograms or more of cocaine.

**B. Count Two (possession with intent to distribute and to distribute a detectable amount of cocaine and a detectable amount of marijuana)**

The government failed to prove beyond a reasonable doubt that on February 18, 2010, that Joel Rivas knowingly and intentionally possessed with the intent to distribute a detectable amount of cocaine, or that Joel Rivas knowingly and intentionally possessed with the intent to distribute a detectable amount of marijuana.

The government did not prove that Rivas knowingly possessed either the cocaine or the marijuana recovered from the storage unit. As previously argued, there was no evidence that Rivas knowingly possessed any of the cocaine or marijuana that was seized at the unit. Rivas was not at the unit on February 18, 2010, and there was no evidence that Rivas knew there were drugs at the unit on that date. When Rivas spoke to Miranda, Miranda told Rivas of the years of incarceration that he faced "because they found that shit garbage that was in there." Rivas responded, "Where? What garbage," expressing his lack of knowledge that drugs were present in the unit at the time of the raid. And at no time did Rivas express that he had a possessory interest

18

in the drugs. While it is true, as the government argued at trial, that Rivas did not have to be in contact with the cocaine to possess it, he nonetheless had to know the drugs were at the storage unit in order to possess the drugs. But Rivas response to Miranda demonstrates that he did not know drugs were in the unit, and the government provided no contrary evidence to prove that Rivas did know that drugs were at the unit at the time of the raid. In addition, there was no evidence that Rivas shared possession of the drugs with Miranda. The storage unit belonged to Miranda. He rented the unit from the landlord. When the police entered, Miranda was standing next to the red Mac tool chest. Miranda's ownership in the business was established in documents found throughout the unit. The fact that Miranda possessed drugs within the unit did not establish that Rivas likewise possessed the drugs either individually or jointly with Miranda. Even though Rivas had distributed marijuana in the past, there was no evidence that the marijuana and cocaine seized on February 18 was jointly possessed by Rivas and Miranda.

Moreover, the government presented no evidence that Rivas intended to distribute any of the drugs seized on February 18, 2010.

For all of the above reasons, this Court should vacate the jury's finding that on February 18, 2010, Defendant Rivas knowingly and intentionally possessed a detectable amount of cocaine or a detectable amount of marijuana.

### C. Count Three (possession of a firearm in furtherance of the drug trafficking crime, namely possession with intent to distribute controlled substances as charged in Count Two)

The government failed to prove beyond a reasonable doubt as charged in Count 3 that Joel Rivas knowingly possessed a firearm on February 18, 2010, in furtherance of the drug trafficking crime of possession with intent to distribute controlled substances as charged in Count Two.

19

The indictment charged that on February 18, 2010, Rivas knowingly possessed two firearms: (1) a Smith & Wesson model 586 .357 caliber handgun serial number BDT8738, and a (2) Smith & Wesson model 5906 9mm caliber handgun. The jury found Rivas guilty of the offense, and indicated on the verdict form that the offense involved both firearms.

To sustain the charge in Count Three, the government had to prove the following three elements beyond a reasonable doubt:

1.    The defendant committed the crime of possession with intent to distribute a controlled substance as charged in Count Two of the indictment; and

2.    He knowingly possessed a firearm; and

3.    His possession of the firearm was in furtherance of the possession with intent to distribute a controlled substance.

First, as previously argued, Rivas did not commit the crime of possession with intent to distribute controlled substances found in the unit on February 18, 2010. Secondly, Rivas did not knowingly possess either firearm on or about February 18, 2010. Thirdly, any possession of a firearm was not in furtherance of the possession with intent to distribute a controlled substance as charged in Count Two.

Turning first to the .357 caliber handgun, this firearm was recovered from a drawer in the red Mac tool chest. The red tool chest was approximately 4½ feet high, and 2 or 3 feet wide by 5 or 6 feet deep. On February 18, 2010, Elgin police officers recovered two bags of cocaine, inositol powder, a small bag of cannabis, and a radio frequency detector from the tool chest. Bills sent to Miranda and bill payment stubs showing payments to Miranda for work done by Lions Tribe Trucking were recovered in the same drawer and underneath the .357 caliber handgun. Government Exhibit Photo 6.

20

As to the 9 mm caliber handgun, this firearm was recovered from a drawer in the desk in the small office upstairs in the back of the storage unit. A small digital scale and inositol bottle were also recovered from the desk in the office, and a plastic bag containing 372.5 grams of cannabis was recovered from a mini-refrigerator in the office. Paperwork in the desk included hospital bills with Miranda's name, paperwork from the U.S. Department of Transportation sent to Miranda, Miranda's business card for Lions Tribe Trucking, a Western Union receipt showing Joel Rivas as sender of $130 to Mexico, 2 blank service sheet invoices for mechanic services with Joel Rivas' phone number in the heading, and a Rock Valley College 2008-2009 notebook in the same drawer as the handgun.

The government did not introduce any evidence associating Rivas with the .357 caliber hand gun. In fact, the government did not introduce any evidence that Rivas even knew that the .357 caliber handgun was in the red Mac tool chest or that he had ever seen the .357 caliber handgun.

As to the 9mm hand gun, forensic scientist Edward Rottman testified that the partial fingerprint on the handgun was made by the same person whose fingerprints were on the Joel Rivas fingerprint card. Mark Liby never testified that he saw Rivas with the recovered handgun, but Glass identified the handgun and claimed he had sold it Rivas. There was, however, no evidence that Rivas knowingly possessed the firearm on February 18, 2010 or on any other day relative to the drugs recovered from the unit on February 18, 2010.

A person possesses a firearm "in furtherance of" a crime if the firearm furthers, advances, moves forward, promotes or facilitates the crime. *Seventh Circuit Pattern (2012)* 18 U.S.C. § 924 ( c ) ("in furtherance" defined). The mere presence of a firearm at the scene of a crime is

insufficient to establish that the firearm was possessed "in furtherance of" the crime. Id. There must be some connection between the firearm and the crime. Id. The "possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a §924( c ) conviction." *United States v. Castillo*, 406 F.3d 806, 814 (7ᵗʰ Cir. 2005), quoting *United States v. Mackey*, 265 F.3d 457, 462 (6ᵗʰ Cir. 2001). For a §924( c ) conviction based on possession to have merit, the evidence must establish a *specific* nexus between the particular weapon and the particular drug crime at issue. *Castillo*, 406 F.3d 815. The underlying offense in this case is possession of, with intent to distribute, the drugs discovered on February 18, 2010. With respect to both firearms, the government did not establish that Rivas possessed either firearm to further the possession and future distribution of the drugs recovered on February 18, 2010. Joel Rivas was not at the unit on February 18, 2010, and the government did not establish that Joel Rivas possessed either firearm to further his possession of the drugs recovered from the storage unit on February 18, 2010.

### D. Count Four (Felon in Possession of Firearm – .357 handgun)

The government failed to prove beyond a reasonable doubt that Joel Rivas, after have been convicted of a felony, possessed the .357 caliber handgun that had traveled in interstate commerce prior to his possession.

At trial, the defense stipulated the Joel Rivas had previously been convicted of a felony, and later at trial Mr. Rivas prior conviction for unlawful delivery of 15 to 100 grams of cocaine was introduced into evidence. Mr. Rivas also stipulated that the .357 caliber handgun had traveled in interstate commerce prior to February 18, 2010.

As already stated above, the government provided no evidence associating Rivas with the

22

.357 handgun.   The government introduced no evidence that Rivas even knew that the .357 claiber handgun was in the red Mac tool chest or that he had ever seen the .357 handgun in the past.   No witness testified that he had ever seen Rivas with the handgun.   Moreover, the personal materials located in the red Mac tool chest belonged to Miranda.   Bills sent to Miranda and bill payment stubs showing payments to Miranda for work done by Lions Tribe Trucking were recovered in the same drawer of the tool chest underneath the revolver.   Further there is no evidence that Rivas possessed the drugs constructively, jointly with Miranda or otherwise.   For all of these reasons, this Court should vacate the conviction for the offense of felon in possession as charged in Count Four.

### E.    Count Five (Felon in Possession of Firearm  – 9 mm handgun)

The government failed to prove beyond a reasonable doubt that Joel Rivas, after have been convicted of a felony, possessed the .357 caliber handgun that had traveled in interstate commerce prior to his possession.

As already noted, the defense stipulated the Joel Rivas had previously been convicted of a felony, and later at trial Mr. Rivas prior conviction for unlawful delivery of 15 to 100 grams of cocaine was introduced into evidence.   Mr. Rivas also stipulated that the 9 mm.  handgun had traveled in interstate commerce prior to February 18, 2010.

As to the 9mm hand gun, forensic scientist Edward Rottman testified that the partial fingerprint on the handgun was made by the same person whose fingerprints were on the Joel Rivas fingerprint card.   As noted in the Motion For New Trial, the defense was not permitted to cross-examine Rottman regarding the misidentification of Brandon Mayfield based upon unusual similarities found in a small portion of his print when compared to a small portion of a latent print

23

recovered from a bomb.  The significance of a partial print as opposed to analysis of a complete

print was crucial to this case.   Moreover, as demonstrated  in Rivas Memorandum supporting his

Motion To Exclude Expert Testimony Regarding Latent Fingerprint Identification, the

misidentification of Mayfield has been widely discussed in the forensic science literature.  R. 135

at 12 - 19.  Even Rottman acknowledged that a small segment of fingerprint of one individual can

be similar to a small portion of fingerprint of another individual.

As previously argued in the Motion for New Trial, the fact that a fingerprint expert was

permitted to testify regarding the certainty of his conclusions regarding the latent print had

significant implications in the context of this case.  Corey Glass, a drug dealer, drug addict, and

convicted felon who was receiving benefits from the government,  claimed that he gave Rivas the

9mm handgun to reduce his drug debt.  Rottman's testimony significantly bolstered Glass' claim.

But in the end Rottman's testimony regarding  fingerprint identification was overstated.  The

Mayfield case has made clear that fingerprints from different people may be highly similar, which

is a particular problem when the examiner is working with a partial print of one finger.  R. 135 at

13 -14.

For all of the above reasons, this court should vacate the conviction for the offense of

felon in possession as charged in Count Five.

Respectfully submitted,

Linda Amdur, Attorney
53 West Jackson Blvd
Suite 657
Chicago, IL 60604
(312) 347-9999

*S/Linda Amdur*
Linda Amdur, Attorney for
Defendant Joel Rivas

24

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| **vs.** ) | **No. 10 CR 617** |
| ) | **Honorable Amy St. Eve** |
| ) | |
| **JOEL RIVAS,** ) | |
| **Defendant.** ) | |

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), Defendant Joel Rivas's Motion For Judgement of Acquittal After Return of Verdict was served pursuant to the district court's ECF system as to ECF filers on September 1, 2013.

Respectfully submitted,

*S/Linda Amdur*
Linda Amdur, Attorney for
Defendant Joel Rivas
53 West Jackson Blvd.
Suite 657
Chicago, IL 60604
(312) 347-9999