UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>JOEL RIVAS | No. 10 CR 617-2<br><br>Judge Amy J. St. Eve |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 360 months in prison.

**I.    Background**

    **A.    The Offense**

From 2007 through 2010, defendant Joel Rivas and Ismael Miranda distributed wholesale quantities of cocaine and marijuana to customers in northern and central Illinois, including Mark Liby and Corey Glass, who Rivas met while serving time at the Illinois Department of Corrections work release center in Peoria, Illinois. After being released from the work release center in 2008, defendant moved to Elgin. He then began regularly selling large quantities of cocaine and marijuana to Glass and Liby. Defendant met with Glass and Liby at various locations between Elgin and Peoria in order to conduct the drug transaction. Sometimes, defendant brought Miranda, who he described as his "right-hand man" to assist with these drug transactions.

Defendant also sold crack cocaine to Glass and Liby during this time period. According to Glass and Liby, they began purchasing crack cocaine from defendant after having problems with the quality of the powder cocaine that they had been buying from defendant.

Rivas and Miranda rented a storage unit located in Elgin, Illinois to use as a center of their narcotics sales, using the Elgin storage unit to conduct sales of the narcotics and to package and store the narcotics for resale. In early 2010, Elgin Police received information from a confidential source (the "CS") that defendants Miranda and Rivas were selling cocaine and marijuana out of the Elgin storage unit. On February 12 and 16, 2010, the CS made two controlled buys of small amounts of cocaine and marijuana from defendant Rivas at the storage unit. On the basis of these controlled buys, and the information provided by the CS, Elgin Police obtained a state search warrant for the unit.

On February 18, 2010, Elgin Police searched the Elgin storage unit pursuant to the search warrant. During the search, police found approximately 220 grams of cocaine that Miranda and Rivas were storing in a toolbox in the Elgin storage unit, as well as 460 grams of marijuana that Miranda and Rivas were storing in a refrigerator in an upstairs office area of the unit.

Miranda and Rivas also kept firearms in the unit in order to protect their drugs, drug proceeds, and their drug operation. Specifically, during the February 18 search, Elgin Police recovered a loaded Smith & Wesson model 586 .357 caliber handgun, bearing serial number BDT8737, in the toolbox within the unit, and a

loaded Smith & Wesson model 5906 9mm caliber handgun, bearing serial number TCK1375, inside of a desk located within the upstairs office area of the unit.

Miranda was present in the unit during at the time of the search, and was subsequently arrested on state drug charges. Following his arrest, Miranda was detained in Kane County Jail pending bond. On approximately March 8, 2010, Miranda placed a call from the Kane County Jail to defendant Rivas. During the call, which was recorded by jail officials, Miranda and Rivas discussed, among other things, the fact that Miranda was arrested by state authorities, rather than the federal government:.

> MIRANDA: Hey, what's happening, bro? The . . . the law came down on us!
>
> RIVAS: Yeah . . . right?
>
> MIRANDA: I just . . . got . . . got . . . got hold of a phone card; it was hard to get hold of your number. Um . . .
>
> RIVAS: I see.
>
> MIRANDA: Um . . . put a stop . . . put a stop to all . . .
>
> RIVAS: Yeah.
>
> MIRANDA: . . . the shit, dude, because it's goddamn D.A., loco.
>
> RIVAS: Oh, yeah?
>
> MIRANDA: Yeah, it's not the feds. I thought it was the . . . the . . . the . . . the big one but no, it's just the D.A.

Miranda then warned Rivas that the police were looking for Rivas, and promised that he would not talk to the police about Rivas.

> MIRANDA: And truth is they're looking for you, loco.

3

| | |
|---|---|
| RIVAS: | Mch! Naah?! |
| MIRANDA: | For real, loco. They asked me about you and don't know you. |
| RIVAS: | No shit! |

Rivas and Miranda then speculated as to the identity of the person who informed the police about their drug operation:

| | |
|---|---|
| MIRANDA: | For real, loco. I don't know who the hell. I bet . . . if it wasn't that fat ass son of a fucking bitch who put the finger on us, it was the goddamn white guy with the white girl who came by or . . . or it was the goddamn . . . the . . . the . . . a . . . someone who . . . someone who doesn't . . . doesn't like you, I don't know who the hell, but I didn't have to be the . . . there and they wouldn't have found me with anything, but I stayed there like a dumb ass, but they asked about you. |
| Miranda: | Okay. I'm alright, bro, I don't know nothing, I stay quiet, I value my life bro . . . I . . . you don't have to worry about anything, I don't know nothing . . . nothing's coming out of me, I don't know nothing. |
| RIVAS: | Wha . . . what fat ass fatso are you talking about? |
| MIRANDA: | The . . . the goddamn dude who lives on Raymond . . . |
| RIVAS: | Nah?! For real? |
| MIRANDA: | Dude, ah . . . ah . . . think, think loco, who the fuck doesn't like us? Who the fuck doesn't like us to send those people there? |
| RIVAS: | The fa . . . you mean that damn fat ass, the . . . the . . . the one that used to work with . . . with me? |
| MIRANDA: | Yes! |
| RIVAS: | Naah?! |

4

| | |
|---|---|
| MIRANDA: | Remember you told me that he was on some thirsty shit? |
| RIVAS: | He was on what? |
| MIRANDA: | He was on some thirsty shit! |
| RIVAS: | Yeah. |
| MIRANDA: | Okay. I'm alright, bro; I don't know nothing; I'll stay quiet; I . . . I value my life, bro, don't you worry about a thing, cause nothing's coming out of me; I don't know nothing. |
| RIVAS: | Yup. |

B. **Presentence Investigation Report**

The November 2012 edition of the U.S. Sentencing Guidelines Manual applies in this case. The government agrees with the PSR's Guidelines calculation.

i. **Offense Level Calculation**

The PSR correctly calculated defendant's Guidelines range as follows:

Count Group One (Counts One and Two)

    Base offense level:              36
    2D1.1(b)(1) firearm:             +2
    3C1.1 obstruction of justice:    +2
                                     40

Count Group Two (Count Three)

    Base Offense Level:              24
    2K2.1(b)(6): felony offense:     +4
    3C1.1 obstruction of justice:    +2
                                     30

PSR at 8-10.

5

The PSR found that defendant has 11 criminal history points, which would normally place him in criminal history category V. PSR 11-13. However, defendant qualifies as a career offender pursuant to Guidelines § 4B1.1 because: (a) he was at least 18 years old at the time of the instant offense; (b) the instant offense is a felony controlled substance offense; and (c) the defendant has at least two prior felony convictions for crime of violence or controlled substance offense—namely, namely: (1) his September 1996 conviction for possession with intent to deliver cocaine in the Circuit Court of Kane County; (2) his April 2004 conviction for manufacture/delivery of cocaine in the Circuit Court of Kane County, Illinois for which he was sentenced to 10 years in prison; and (3) his April 2004 conviction for manufacture/delivery of cocaine in the Circuit Court of McHenry County, for which he was sentenced to 10 years in prison. PSR at 9. Accordingly, his criminal history level is VI. PSR at 13.

Based on an offense level 40 and a criminal history level VI, the applicable Guidelines range is 360 months to life in prison. PSR at 19.

### ii. Defendant distributed over 5 Kilograms of Cocaine, 35 pounds of marijuana, and 4.8 kilograms of Crack Cocaine

The PSR correctly calculated the drug quantity for which defendant was responsible. PSR at 8. The basis for this finding is set forth in the government's version of the offense and the government's response to defendant's motion for new trial. Dkt. #195.

      **iii. Defendant possessed a firearm in connection with the offense**

Elgin police recovered two firearms from the storage unit from which defendant ran his drug operation. Although defendant was convicted under § 924(c), the PSR's application of the two-level enhancement under § 2D1.1(b)(1) was not double counting because defendant possessed two guns in the storage unit. PSR at 8.

      **iv. Defendant obstructed justice**

The PSR correctly increased the offense level two levels for obstruction of justice pursuant to Guideline § 3C1.1. During the course of his jury trial, defendant did not simply hold the government to its burden of proof. During his testimony, defendant falsely denied involvement in the charged offenses. He denied selling any cocaine to Mark Liby or Corey Glass. Instead, he falsely claimed that he had merely sold them marijuana on a handful of occasions. Defendant further denied that he conspired with Ismael Miranda to distribute cocaine or marijuana and falsely claimed that he had no idea that Miranda was involved in drug trafficking. Finally, defendant falsely testified that he had moved out of the storage unit in December 2009, two months prior to the search of the storage unit in February 2010. In finding defendant guilty on all counts, the jury clearly concluded that defendant was lying throughout his testimony.

**II. Defendant Should Receive a Sentence within the Guidelines Range**

A careful consideration of the § 3553(a) factors weighs in favor of a sentence of 360 months in prison, which is the low-end of the applicable Guidelines range.

A.  **Nature and Circumstances of the Offense**

The distribution of cocaine and other narcotics is a serious offense that has well documented deleterious effects not only on traffickers and users, but on the community at large. Distribution of narcotics is an essential component of the drug trade—an underground economy marked by violence, addiction, and ruined lives. By repeatedly distributing cocaine and other illegal drugs, defendant introduced a poison into his own community. Among its users, the poison of illegal drugs destroys lives by encouraging cycles of addiction and hopelessness. Among its sellers, the sale of illegal drugs promotes violence and reduces one's ability and ambition to become a productive member of society.

Defendant's possession firearms in connection with his drug trafficking activity further underscores the need for a significant sentence in this case. Despite his prior felony convictions, at the time of his arrest, defendant had two loaded handguns within the Elgin storage unit. Defendant's possession of firearms in connection with his drug trafficking created a significant danger to the community.

B.  **History and Characteristics of Defendant**

Defendant is a 35-year old lifelong drug dealer. PSR at 15. He has an extensive criminal history, including several serious prior felony convictions. In 1996, defendant was convicted of possession of a controlled substance within intent to deliver in Kane County, Illinois. This was not a minor drug crime. According to the PSR, defendant possessed between 100 and 400 grams of cocaine. He was

subsequently sentenced to 6 years in the Illinois Department of Corrections. While in prison, defendant committed 25 violations. PSR at 12.

In 1999, defendant was convicted of unlawful delivery of a controlled substance in McHenry County. PSR at 12. That same year, he was convicted of manufacture/delivery of a controlled substance in Kane County. PSR at 12. Defendant was sentenced to 10 years in the Illinois Department of Corrections, to be served concurrently. PSR at 12-13. Defendant served the end of his sentence in the work release program at the Peoria Adult Transition Center. PSR at 13. As the Court heard at trial, while in the work release program, defendant returned to selling drugs.

Defendant's lengthy criminal history is in many ways inexplicable. He has attended college and worked as a mechanic, and would seem to have the skills and abilities necessary to lead a legitimate and productive lifestyle. PSR at 16-18. Nevertheless, defendant has repeatedly chosen to lead a life of crime and drug dealing.

### C. Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of Defendant

Defendant's background demonstrates that he is at serious risk for recidivism. Despite his prior convictions, his lengthy stints in the Illinois Department of Corrections, and his participation in a work release program, defendant continues to commit serious crimes. Unlike so many defendants, defendants had the skills to maintain employment. Nevertheless, he has repeatedly turned to drug trafficking and other criminal conduct. These patterns have

persisted in defendant's life for years, and he does not appear to have any intention of ever pursuing a healthy, legitimate lifestyle. Defendant's multiple drug-related convictions demonstrate a blatant disregard for the risk that such offenses pose to the community. His possession of multiple guns in connection with his drug trafficking only further aggravates his crimes.

**D.     Need to Promote Respect for the Law and Provide Just Punishment**

A guidelines sentence will promote respect for the law by emphasizing to others the difficult consequences that follow from involvement in drug trafficking. By imposing a guidelines sentence, the Court will emphasize that, although drug trafficking may provide a steady source of income for people unwilling to do the hard work required for legitimate employment, such behavior is reprehensible and will be punished severely. A guidelines sentence may help to deter others from making the same poor choices as defendant.

Given the seriousness of this offense, a guidelines sentence is also appropriate to provide just punishment for defendant. Defendant has been a lifelong drug dealer, the harmful effect of which cannot be understated, and the Court should also consider the way in which defendant's actions had adverse effects on the people who used the drugs he distributed and on the community where those drugs were distributed. Similarly, the court should consider defendant's possession of firearms despite his prior felony convictions as a significant aggravating factor deserving of a sentence within the Guidelines.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 360 months in prison.

Dated: October 7, 2013

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney

By: */s/ Joseph H. Thompson*
JOSEPH H. THOMPSON
ERIKA L. CSICSILA
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 469-6131